Wilkins v. SSA                    CV-97-160-JD  03/13/98

UNITED STATES DISTRICT COURT FOR THE
                      DISTRICT OF NEW HAMPSHIRE


<u>Donald Wilkins</u>

        v.                          Civil No. 97-160-JD

<u>Commissioner, Social</u>
<u>Security Administration</u>


                            O R D E R


    The plaintiff, Donald Wilkins, brings this action pursuant to

42 U.S.C. § 405(g), seeking judicial review of a final decision

of the defendant, Acting Commissioner of the Social Security

Administration ("Commissioner"), denying his application for

disability benefits.  Before the court are the plaintiff's motion

to reverse or remand the Commissioner's decision (document no.

6), and the government's motion to affirm the decision of the

Commissioner (document no. 11).



                           <u>Background</u>

    Pursuant to Local Rule 9.1, the parties have filed the

following joint statement of material facts, which the court

incorporates <u>verbatim</u>:

              <u>JOINT STATEMENT OF MATERIAL FACTS</u>

    I.    <u>ADMINISTRATIVE PROCEEDINGS</u>.

        The plaintiff filed concurrent applications for a
    period of disability (Title II) and for supplemental

security income benefits (Title XVI) on September 13, 1994 (Tr. 82-84, 134-136) and alleged an inability to work since August 28, 1994 (Tr. 82, 134). The Social Security Administration initially denied the applications (Tr. 95-96, 139-140) and denied them after reconsideration (Tr. 100-101, 144-145). An Administrative Law Judge ("ALJ") held a hearing on April 25, 1995, before whom the plaintiff and his attorney appeared and testified, considered the matter de novo, and thereafter found the plaintiff was not "disabled" and not entitled to benefits (Tr. 32-48). At the hearing, Plaintiff appeared before the ALJ and requested that further evaluation be done on the connection between Plaintiff's reaction to stress and his cardiac problems (Tr. 63-81). The plaintiff sought Appeals Council review; and on January 31, 1997, the Council denied his request for review (Tr. 3-4), thereby rendering the ALJ's decision the "final decision" of the Commissioner, subject to judicial review.

II. THE MEDICAL RECORD.

The plaintiff claimed a cardiac condition began to bother him in November 1993 and he alleged the onset of disability on August 8, 1994 (104-106). On February 23, 1995, he requested a hearing before an ALJ and claimed his disability was due to a heart condition and reaction to stress (Tr. 102). The certified record indicated the claimant was born on September 5, 1967, and he was 27 years old at the time of his application. He has an 11th grade education, was enrolled in and completed a GED program in 1995, had additional training in computer-aided drafting, and was a certified nursing assistant (Tr. 66, 108). In terms of disability insurance coverage under Title II of the Act, the plaintiff's last date of insured status is December 31, 1998 (Tr. 131). He has seven years work experience as a stock clerk, nursing home worker, community integration worker and home health care provider (Tr. 117-122).[1]

---

[1]The plaintiff's annotated earnings record indicated he also worked as a gas station attendant, cashier, and nurse's aide and

2

The medical evidence indicated that on January 30, 1994, K. Little, M.D. examined the plaintiff at the Mary Hitchcock Memorial Hospital. The plaintiff said a near-syncope[2] experience occurred after he pushed his car out of a snow bank but that he did not lose consciousness. He described no dyspnea, no palpitations, no skipped beats, and no nausea; the pain was pressure across the lower sternum and chest and non-radiating; he had a positive history for heartburn and no ulcer disease (Tr. 147-150). The physician reported that his chest pressure was not reproducible on chest wall palpitation and an EKG showed a left axis deviation[3] and an incomplete right bundle branch block[4] and no changes from November 1993. Dr. Little felt his symptoms were related to extreme stress levels and they resolved rapidly with only oxygen; the physician advised that the plaintiff see a cardiologist and avoid stressful situations (Tr. 147-151).

Apparently, the plaintiff had reported a similar experience in November or December 1993. The episode followed an argument with mentally retarded patients who were in the plaintiff's care. A Dr. Schlepphorst in Concord performed an echocardiagram that showed overall normal results, a Holter monitor testing showed

---

was self employed in 1994; he reported no earnings in 1988 (Tr. 108, 112-116, 132).

[2]"Syncope" is a temporary suspension of consciousness due to generalized cerebral ischemia; a faint or a swoon. Dorland's Illustrated Medical Dictionary (28th ed. 1996), p. 1622.

[3]"Left axis deviation" is an abnormal heartbeat wave (Cardiology Dept., Lariboisiere, Paris, France, Abstract - Progressive ECG changes in arhythmogenic right ventricular disease, Eur. Heart J., Nov. 1996).

[4]"Bundle branch block" is an abnormality in the conduction of the cardiac impulse. Dorland's Illustrated Medical Dictionary (26th ed. 1981), p. 197.

short runs of nonsustained ventricular tachycardia[5] without correlating symptoms.  The plaintiff was referred to a physician for electrophysiological studies, but he did not keep his appointment but rather reduced his stress level at work (Tr. 148, 151).

On February 7, 1994 Dr. John Jayne, M.D., a fellow in cardiology at Hitchcock Clinic, examined the plaintiff and, other than episodes above, reported he had been otherwise healthy.  He currently took no medications and looked well but somewhat anxious.  The plaintiff had good exercise tolerance, he normally practiced karate, and vigorously walked five to ten miles daily without chest discomfort.  However, he reported that he had an uncle who had a pacemaker and that his father died suddenly in his early 40's playing basketball (Tr. 151).  He noted some tightness around his lower chest for several years which worsened when he felt stressed; he smoked cigarettes for ten years but was currently smoking one or two per day.  Although Dr. Jayne did not believe his chest tightness represented coronary disease, the doctor noted that the possibility should be kept in mind.  His impression was that the syncopal episodes may be vasovagal in origin (related to the vagus nerve which helps regulate body function and is characterized by sudden losses of consciousness) and he recommended that Plaintiff undergo a symptom limited (maximum) stress test and tilt table test (Tr. 151-152).

Following another syncopal episode on March 13, 1994, the plaintiff was admitted to Catholic Medical Center (Tr. 153). On March 15, 1994, Dr. Bruce Hook, a specialist in cardio-vascular diseases noted that the plaintiff had experienced four syncopal episodes since February 1993 and that the episodes occurred in stressful situations (Tr. 153).  Dr. Hook conducted an

---

[5]"Tachycardia" is excessive rapidity in the action of the heart; the term is usually applied to a heart rate above 100 per minute and may be qualified as atrial, junctional (nodal), or ventricular, and as paroxysmal. Dorland's Illustrated Medical Dictionary (26th ed. 1981), p. 1306.

exercise tolerance test on the plaintiff noting that previous tests conducted by Dr. Schlepphorst in Concord showed the Plaintiff's heart appeared to have "frequent ventricular premature beats which were asymptomatic" and an "incomplete right bundle branch block with left anterior hemiblock" (Tr. 153). The plaintiff told Dr. Hook that he had one syncopal episode in November 1993 after arguing with several mentally disabled clients at his home; he apparently feel to the floor and had no recollection; there was no seizure activity observed (Tr. 157). He was later seen at the Hitchcock Clinic for chest complaints unrelated to his syncope; a CT scan of the brain was normal (Tr. 155, 157). He said there were three other syncope episodes, one while instructing his clients at work with sign language when he felt dizzy for one or two seconds before losing consciousness for about a minute without any preceding palpitations or chest discomfort (Tr. 157). An EKG performed by Dr. Hook again demonstrated normal sinus rhythm with an incomplete right bundle branch block and left anterior hemiblock[6] with occasional multi focal PVCs[7]; an echocardiagram was normal without evidence of underlying structural heart disease (Tr. 155-156). Dr. Hook recommended further tests to determine "the etiology of this patient's syncopal episodes" because of his concern about the origin (Tr.156).

During exercise testing, the plaintiff exercised for 11 minutes and 46 seconds and reached a maximum heart rate of 166 using the Bruce protocol. Dr. Hook found there was no evidence of angina, no ischemic ECG changes, insignificant ectopy, his functional capacity was normal and the MIBI images were normal (Tr. 164-

---

[6]"Left anterior hemiblock" is failure in conduction of the cardiac impulse in either of the two main divisions of the left ventricular conducting system (bundle of His); it is called "left anterior hemiblock" when the anterior-superior division is interrupted. Dorland's Illustrated Medical Dictionary (26th ed. 1981), p. 590.

[7]"PVC" is an abbreviation for premature ventricular contraction. Mosby's Medical, Nursing and Health Dictionary, p.990 (3rd ed.1990).

166). The next day, he underwent a Tilt Table Test which was normal in the presence and absence of Isuprel[8], although Dr. Hook noted that "the patient did have frequent PVCs with occasional couplets"(Tr. 153, 157-159). An invasive electrophysiological study (cardiac catherization) demonstrated no evidence of ventricular arrhythmia; however, he had easily inducible atrial fibrillation (Tr. 160-161). On the patient's discharge, Dr. Hook concluded that "while there was still a small amount of uncertainty, it is quite likely that the patients episodes of syncope were related to very rapid and transient atrial fibrillation (Tr. 154). Therefore, he prescribed Sotalol[9] 80 mg bid and aspirin for anticoagulation. After the plaintiff demonstrated no evidence of pro-arrhythmia, Dr. Hook discharged him on March 17, 1994 and told him to do no heavy lifting or heavy exertion for one week (Tr. 153-154).[10]

On two occasions in April and May of 1994, the plaintiff went to Central New Hampshire Community Mental Health Services, Inc. His chief complaint was "difficulty managing stress" and he was given a relaxation tape and taught breathing exercises (Tr. 178). He was 6' 2" tall and weighed 255 pounds (Tr. 180). On his intake form, the Plaintiff wrote that he was "told if he doesn't seek [treatment he'll die." The plaintiff also stated that he had been raped in 1988 by a stranger and "had a wonderful childhood." He had "long term difficulties with tension and bottling up feelings resulting in physical illness." The social worker noted that, although there were some anxiety

---

[8]"Isuprel" is indicated for relief of bronchospasm and has a cardiac stimulant effect. Physician's Desk Reference, p. 2211, (49th ed. 1995).

[9]"Sotalol" is indicated for treatment of ventricular arrhythmias. Id. at p. 611.

[10]The claimant was instructed to follow up with his regular physician, Dr. Schlepphorst, but there were no records presented (Tr. 154).

symptoms they were not sufficient for a Generalized Anxiety Disorder diagnosis (Tr. 181). However, the social worker also noted that the severity of psychosocial stressors was extreme and that the plaintiff had been diagnosed with a heart condition (Tr. 181).

The social worker noted his dramatic presentation, and noted he had average insight and intelligence and that he was not homicidal or suicidal. The plaintiff displayed no thought disturbances; his affect was depressed and hopeless; his concentration was mildly impaired and moderately anxious. He had a "Fair to Good" prognosis if he followed through actively managing stress and utilizing relaxation techniques; his strength were friends' support and intelligence. The plaintiff was instructed in stress management, breathing techniques and exercise. A month later, he reported that Tai Chi, breathing techniques and relaxation tapes helped "manage stress, improve health and feelings of well being"; he was to call if he needed an appointment (Tr. 178-182).

In May 1994, Dr. Hook saw the plaintiff in follow-up examination and noted that for over a month he had no problems. The plaintiff said he had a syncopal episode one day after being discharged from hospital testing on March 17, 1994. The plaintiff said he was in a room with his sister and a client when he was involved in a heated argument; he became angry, felt pressure on his head and woke up on the floor.[11] Dr. Hook placed him on a monitor for two weeks, during which time he had no symptoms, no ECG abnormalities and no further syncopal episodes. Dr. Hook made no changes in the plaintiff's regimen and would see him if he had any problems (Tr. 167-168). After this visit Dr. Hook wrote to Dr. Schlepphorst stating "I wish I could tell you I was 100% certain that his initial syncope was due to rapid atrial fibrillation. I have thought from the beginning that his symptoms were more consistent with

---

[11]During this time, the plaintiff provided home services to a disabled young man (Tr. 176).

7

vasovagal or neurally mediated syncope, although his tilt-test was normal. It is clear that all of these episodes occur in the setting of a stressful situation. Nonetheless, the induction of rapid atrial fibrillation is certainly an abnormal finding and this could be accounting for his symptoms" (Tr. 167).

When writing to Dr. Schlepphorst after an office visit in September 1994, Dr. Hook commented that, since his last visit in May 1994, the plaintiff stopped taking his Sotalol medication almost immediately, which he said was because he lost his job and had no money, and currently took no medication. The plaintiff said since then, he had two or three syncopal episodes. In examination, he appeared in no distress and Dr. Hook noted his recent episodes had occurred in the absence of medication. He gave the plaintiff Lopressor[12] 50 mg bid which was available in generic form at quite a low cost (Tr. 169).[13]

Following the administrative hearing before ALJ Fallon and in response to plaintiff's attorney's request, psychiatrist James J. Adams, M.D., conducted a comprehensive evaluation on May 19, 1995 (Tr. 194-196). Prior to the interview and examination, Dr. Adams reviewed a summary prepared by plaintiff's counsel (Tr. 185-189), a CTASS (cues for tension and anxiety survey schedule) form prepared by plaintiff (Tr. 183), a consult from Dr. Hook dated 9/19/94 (Tr. 169) and a history and physical from Dr. Hook dated 3/14/94 (Tr. 155-156).

Dr. Adams reported that the plaintiff arrived at

---

[12]"Lopressor" is a beta blocker indicated for treatment of hypertension, angina or myocardial infarction. Physician's Desk Reference (49th ed. 1995), p. 1066.

[13]Dr. Hook completed a cardiac questionnaire on September 19, 1994 and found no symptoms of congestive failure, pulmonary edema, angina pectoris, no abnormalities of the extremities, and he reported no other significant diseases or disorders (Tr. 170).

8

the appointment unaccompanied, his posture and gait were unusual in that he actively avoids eye contact", and his dress and demeanor appropriate to the situation. The plaintiff said that no one would employ him because of his heart condition. He stated he gets tense and anxious in work situations, anticipating that he will experience "heart problems" which frequently arise in the context of work conflict. Noting a bump on his head, the plaintiff said he experienced syncopal episodes "at least weekly" and he awakens on the floor; he denied incontinence during the episodes (Tr. 194).

The plaintiff denied any personal history of past psychiatric treatment and said he lived with a 65-year old woman in a platonic relationship. He assumed the household duties and walked the dog, while she offered free rent and companionship. Dr. Adams reported in a Mental Status Exam that Plaintiff was neatly dressed, well groomed, well nourished and generally a healthy appearing white male; his speech was a normal rate, organized and goal directed; his mood was euthymic although anxious; his affect was quite restricted: his content of thought was remarkable for chronic preoccupation with danger in the environment and his physical health, but it did not reach delusionary level; and he denied any suicidal and homicidal thoughts and auditory hallucinations. He was oriented in four spheres; he appeared to have average intelligence, remote memory was intact; he offered a vague medical history; recent memory and concentration were "Good"; and he was abstract on similarities and proverbs; demonstrated good judgment in a simulated scenario (Tr. 195).

Dr. Adams assessed his current level of functioning and determined that his typical day was spent maintaining his housemate's residence, cooking, cleaning and shopping; he was independent in maintaining his personal hygiene. Dr. Adams commented there appeared to be "no change in functioning related to a psychiatric condition" (Tr. 195-196). The plaintiff described that he had limited tolerance for interacting and communicating with family members, neighbors and friends; he felt at risk away from his residence and believed he was vulnerable to attack, particularly by other men. Dr. Adams noted that this

9

appears to be a consistent concern of his and is likely the result of a mental condition (Tr. 195).

The plaintiff described no change in his ability to focus his attention to understand complex directions though notes that he experienced the reported "episodes" when performing tasks under "pressure"; however, he could enjoy himself in any non- stress related activity. Dr. Adams noted that this appeared to be a change in his functioning due to a mental condition (Tr. 196). Dr. Adams diagnosed this condition <u>as an Axis I</u> Anxiety Disorder NOS with a current GAF[14] of 50, dropping from 60 in the past year. The psychiatrist noted that Mr. Wilkins was not currently being treated and that "in light of this lack of treatment it is unlikely that he will resolve or his situation will improve dramatically" (Tr. 196).

After the ALJ's decision, Plaintiff's medical and psychiatric notes were reviewed by Dr. Wing and his comments were submitted to the Appeals Council (Tr. 24). Dr. Wing stated, "I suspect that this man's psychiatric condition is more serious than his cardiac condition, but that there is substantial interaction between the two, as is indicated in Dr. Hook's notes" (Tr. 24).

<u>Discussion</u>

Wilkins alleges that the administrative law judge's (the "ALJ") determination was improper on at least two grounds. Wilkins first asserts that the ALJ did not fully develop the record concerning the interaction between Wilkins' heart

---

[14]"GAF" (Global Assessment of Functioning Scale of the American Psychiatric Association). Takes into account psychological, social, and occupational functioning, but does not include physical or environmental limitations. American Psychiatric Association, <u>Diagnostic and Statistical Manual of Mental Disorders</u> (4th ed. 1994).

10

condition and his anxiety disorder.  Second, Wilkins contends that the ALJ failed to consider the combination of his heart condition and anxiety disorder in determining if he was sufficiently disabled to be awarded disability benefits.  The court considers these claims seriatim.


A.    The Development of the Record Concerning the Inter-
      action Between Wilkins' Heart Condition and His Anxiety
      Disorder

It is well established that claimants have the initial burden of proof of establishing a disability which precludes their returning to their prior employment.  See, e.g., Goodermote v. Secretary of Health & Human Servs., 690 F.2d 5, 7 (1st Cir. 1982).  Therefore, Wilkins "is, of course, the one with the burden of proof on the issue of whether he has a medically determinable impairment which disables him from performing the jobs he has done in the past."  Currier v. Secretary of Health, Ed. & Welfare, 612 F.2d 594, 598 (1st Cir. 1980).  This burden entails furnishing "requisite medical and other evidence within [the claimant'] grasp . . . and show[ing] reasonable diligence in maintaining his claim."  Miranda v. Secretary of Health, Ed. & Welfare, 514 F.2d 996, 998 (1st Cir. 1975) (citations omitted).  Although the Commissioner "must make an investigation that is not wholly inadequate under the circumstances," id., "[i]n most

11

instances, where appellant himself fails to establish a sufficient claim of disability, the [Commissioner] need proceed no further," Currier, 612 F.2d at 598. In Currier, however, the First Circuit established that the Commissioner has a heightened responsibility to develop the record and supplement the evidence where:

> the appellant is unrepresented, where the claim itself seems on its face to be substantial, where there are gaps in the evidence necessary to a reasoned evaluation of the claim, and where it is within the power of the administrative law judge, without undue effort, to see that the gaps are somewhat filled--as by ordering easily obtained further or more complete reports or requesting further assistance from a social worker or psychiatrist or key witness.

612 F.2d at 598. Accordingly, the First Circuit has found that the Commissioner failed to fulfill its responsibility of adequately developing the record, or has otherwise remanded for further evidence without such an explicit finding, where the claimant lacked counsel and/or was mentally impaired. See, e.g., Heggarty v. Sullivan, 947 F.2d 990, 997 (1st Cir. 1991) (not represented by counsel); Deblois v. Secretary of Health & Human Servs., 686 F.2d 76, 81 (1st Cir. 1982) (not represented by counsel, mentally impaired); Currier, 612 F.2d at 598 (not represented by counsel, mentally impaired). Indeed, the First Circuit has explicitly stated that they do not perceive "such responsibility [on the Commissioner's part] arising in run of the

12

mill cases." Id.

Wilkins alleges that he suffers from a heart condition that is exacerbated by an anxiety disorder. Although the heart condition alone may be insufficient to establish that he is disabled, Wilkins asserts it is augmented by the synergistic relation between the heart condition, which is triggered in part by stress, and the anxiety disorder. The medical evidence accumulated by Wilkins going into the administrative hearing largely focused upon the physical heart condition. At the hearing, Wilkins' representatives specifically identified the need to augment the record with medical reports addressing the alleged interrelationship of the heart condition and the mental impairment. Because of Wilkins' inability to pay for the additional evaluation, he requested that the Commissioner supply him with a psychiatrist. The ALJ indicated that although he would try to find a psychiatrist, he most likely could only get a psychologist, and that he understood this was not what Wilkins wanted or needed. See Tr. at 68-70, 79-80. Eventually, a psychiatrist was indeed obtained.

On May 19, 1995, Wilkins was examined by the psychiatrist, Dr. James Adams. Dr. Adams was notified that he should evaluate whether Wilkins suffered from a mental impairment such as an anxiety or panic disorder, and whether this disorder in turn

13

interacted with or exacerbated Wilkins' heart condition. Dr. Adams' evaluation established that Wilkins did indeed have an anxiety disorder, and rated this disorder at GAF 50, a serious impairment. See Tr. at 196, 201. However, Dr. Adams' evaluation failed to address the alleged interrelation between the anxiety disorder and the heart condition. It is evident in reading the evaluation that this was not the focus of Dr. Adams' assessment, which evaluated the general psychological state of Wilkins: his appearance; his mental aptitude; his personal hygiene; and his social functioning. See Tr. at 194-96. In fact, in his final assessment of Mr. Wilkins' "capability," Dr. Adams stated "I believe Mr. Wilkins is capable of managing funds on his own behalf." Tr. at 196.

The record provides little evidence regarding the interplay between Wilkins' two conditions. Wilkins argues in part that the Commissioner's denial of benefits arose from this gap in the evidence, which in turn arose from the Commissioner's failure to meet the responsibility to develop the record fully. While it is true that the claimant's and the Commissioner's "responsibilities resist translation into absolutes," Miranda, 514 F.2d at 998, Wilkins' argument seeks to shift his burden of supplying evidence of a disability onto the Commissioner's shoulders.

14

It was Wilkins's responsibility to exercise reasonable diligence in providing the Commissioner with medical evidence regarding the interplay between his heart condition and his anxiety disorder.  Wilkins had identified the information necessary to his claim and requested the Commissioner's assistance in obtaining it.  Confronted with the psychiatrist's report, which arguably failed to address the issue of the combined effects of the conditions, Wilkins never procured the necessary medical reports and evaluations.  Indeed, over the ensuing two year period when the claim passed through the Appeals Council and finally to this court, Wilkins only sought one additional medical review and evaluation.[15]  The evaluation, performed by Dr. Wing, merely indicated the doctor's suspicion that there was an interplay between the conditions, and recommended further monitoring.[16]  Wilkins' argument that the ALJ erred by failing to have the psychiatrist's evaluation reviewed by the cardiologist confuses the relative burdens.  Wilkins

---

[15]Additional evidence may be submitted, for example, before the Social Security Administration Appeals Council, see 20 C.F.R. §§ 404.970, 416.1470 (1996), or before the administrative law judge if the notice of decision has not been mailed, see 20 C.F.R. § 404.944 (1996).

[16]Wilkins' argument that financial incapacity prevents him from adequately documenting his disability is undermined by his success in obtaining numerous doctors' evaluations, including the evaluation of Dr. Wing.

therefore failed to "exercise reasonable diligence in furnishing the [Commissioner] with evidence relevant to his claim," Miranda, 514 F.2d at 998, and the lack of evidence substantiating a disability is an adequate basis for the Commissioner's denial of benefits.

Moreover, the circumstances giving rise to a heightened responsibility on the part of the Commissioner are not present here. Wilkins is represented by counsel and, although afflicted with an anxiety disorder, has the requisite mental capacity to manage his affairs as indicated by Dr. Adams' evaluation. Furthermore, the ALJ was diligent and tried "to see that the gaps are somewhat filled" by providing for the psychiatrist's evaluation as requested by Wilkins. Currier, 612 F.2d at 598; cf. Rafael Rico v. Secretary of Health, Ed. & Welfare, 593 F.2d 431, 433 (1st Cir. 1979) (Secretary must make reasonable inquiry into claim of disability, but need not go to inordinate lengths to develop claimant's case). The Commissioner's investigation was "not wholly inadequate under the circumstances," Miranda, 514 F.2d at 998, and the plaintiff is not entitled to reversal on this basis.

B.   The ALJ Did Not Consider Plaintiff's Combined Heart and Mental Impairments in Making His Decisions

20 C.F.R. § 404.1520 (1996) establishes the following five sequential steps that must be considered in determining whether a claimant is disabled:   (1) whether claimant is presently engaged in substantial gainful activity; (2) whether claimant has a severe impairment; (3) whether the impairment meets or equals a listed impairment; (4) whether the impairment prevents claimant from performing past relevant work; and (5) whether the impairment prevents the claimant from doing any other work. Pursuant to 20 C.F.R. § 404.1523 (1996), the Commissioner is required to consider "the combined effect of all of [the claimant's] impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity.   If [the ALJ finds that the claimant suffers from] a medically severe combination of impairments, the combined impact of the impairments must be considered throughout the disability determination process."   See also 42 U.S.C.A. § 423(d)(2)(C) (West 1991).

Wilkins asserts that the ALJ failed to consider the combined effect of his claimant's heart condition and anxiety disorder. The combined impairments were only addressed explicitly once in the ALJ's decision.   In the "findings" section the ALJ concluded:

17

> The medical evidence establishes that the claimant has severe cardiac dysrhythmia and anxiety, but that he does not have an impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P, Regulations No, 4.

Tr. at 41. Implicit in the ALJ's conclusion at step three that the plaintiff did not have a combination of impairments equal to a listed impairment, is a conclusion at step two that the plaintiff had a "medically severe combination of impairments." See 20 C.F.R. § 404.1523. Once the ALJ made this conclusion, he was required to consider the combined impairments at each subsequent step of the analysis. However, the ALJ failed to consider the combined effect at step four. In finding that the claimant could engage in past employment, the ALJ simply stated that the claimant was limited to working in non-stressful situations and carrying less than fifty pounds, and that "claimant's impairments do not prevent the claimant from performing his past relevant work." Tr. at 41, 42. Moreover, the general discussion throughout the decision did not indicate that the combined effect of the claimant's impairments were considered. The decision separately addressed the heart condition, the anxiety disorder, and claims of pain. See Tr. At 37-39. The ALJ did not discuss the possible interactive or cumulative effect of the impairments. Nor did he find that the evidence failed to support a conclusion that the combined

18

impairments prevented the claimant from returning to his prior work.

The court finds that the combined effect of the claimant's impairments was not adequately considered at the requisite steps of the five step analysis, and that the conclusory statement of the ALJ did not meet the statutory and regulatory requirements. See 42 U.S.C.A. § 423(d)(2)(B) (West 1991); 20 C.F.R. § 404.1523 (1996). In this regard, the circumstances are similar to Anderson v. Heckler, where the Eighth Circuit reversed and remanded in part because the ALJ addressed the combined effect of impairments solely in a conclusory statement. See 805 F.2d 801, 805 (8th Cir. 1986) ("We do not believe that this statement standing alone indicates that the ALJ has complied with the statutory requirement that he consider the combined effect of a claimant's impairments.").

Congress has empowered the court to enter a judgment "affirming, modifying, or reversing the decision of the Secretary, with or without remanding the case for a rehearing." 42 U.S.C.A. § 405(g) (West 1991). The court reverses and remands the case to the Commissioner for rehearing consistent with this order.[17]

_____

17Given its conclusion, the court need not consider the plaintiff's remaining claim that there was not substantial

19

## Conclusion

The court grants the plaintiff's motion to reverse and remand the case to the Commissioner pursuant to the fourth sentence of 42 § U.S.C. 405(g) (document no. 6), and denies the defendant's motion to affirm the decision of the Commissioner (document no. 11). The clerk is ordered to close the case.

SO ORDERED.

_____
Joseph A. DiClerico, Jr.
District Judge

March 13, 1998

cc:   Ellen Jane Musinsky, Esquire
      David L. Broderick, Esquire

_____

evidence to support the ALJ's decision.

20